# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### BECKLEY DIVISION

GREENBRIER HOTEL CORPORATION, et al.,

       Plaintiffs,

v.                                                                  CIVIL ACTION NO.   5:14-cv-15201

LEXINGTON INSURANCE COMPANY, et al.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Plaintiffs' Motion to Vacate and Set Aside the Decision of the Appraiser/Umpire* (Document 80) and *Memorandum in Support* (Document 81), the *Defendants' Cross-Motion for Partial Summary Judgment as to Breach of Contract and Hayseeds Damages* (Document 83), the *Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Vacate the Appraisal Award and in Support of Defendants' Cross-Motion for Partial Summary Judgment as to Breach of Contract and Hayseed Damages* (Document 84), the *Plaintiffs' Response to Defendants' Motion for Summary Judgment* (Document 85), the *Plaintiffs' Reply Memorandum in Support of Motion to Invalidate or Set Aside Report and Findings of the Umpire* (Document 86), and the *Defendants' Reply Memorandum of Law in Further Support of Their Cross-Motion for Partial Summary Judgment as to Breach of Contract and Hayseeds Damages* (Document 88).   The Court has also reviewed the *Affidavit of Marvin W. Masters* (Document 87), supplied in support of the Plaintiffs' opposition to the Defendants' motion for summary judgment, and all attached exhibits.   In addition, the Court has reviewed the *Defendants' Motion to Strike the Affidavit and Curriculum Vitae of Larry R. Weatherford and the Reply Affidavit of Marvin W.*

*Masters* (Document 89) and *Memorandum of Law in Support* (Document 90), the *Plaintiffs'*

*Response to Defendants' Motion to Strike the Affidavit and Curriculum Vitae of Larry R.*

*Weatherford and the Reply Affidavit of Marvin W. Masters* (Document 91), and the *Reply*

*Memorandum of Law in Further Support of Defendants' Motion to Strike the Affidavit and*

*Curriculum Vitae of Larry R. Weatherford and the Reply Affidavit of Marvin W. Masters*

(Document 92).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Plaintiffs, Greenbrier Hotel Corporation and the Greenbrier Sporting Club, Inc.

(collectively, "the Greenbrier"), initiated this action in the Circuit Court for Greenbrier County.

They named the following Defendants: Lexington Insurance Company (Lexington), XL Insurance

America, Inc. (XL), ACE American Insurance Company (ACE), The Underwriters at Lloyd's

London (Lloyd's), McLarens Young International, Inc. (McLaren's), and Rocco M. Bianchi

(collectively "Insurers").   The Plaintiffs' *Amended Complaint* (Document 1-3) was filed in state

court on April 16, 2014.   The Defendants removed the matter to federal court on April 23, 2014.

This case involves a dispute over insurance for losses allegedly suffered by the Greenbrier

following the *derecho* windstorm of June 29, 2012.[1]   The Greenbrier was scheduled to begin

hosting its Greenbrier Classic golf tournament three days later.   The region experienced

widespread power outages, and trees, spectator areas, skyboxes, and camera towers at the

Greenbrier were damaged.   Power was restored at the Greenbrier prior to the Classic, and the

---

1 According to the National Weather Service, "a '*derecho*' is a long-lived, rapidly moving line of intense thunderstorms that produces widespread damaging winds in a nearly continuous swath."  *The Derecho of June 29, 2012*, National weather Service, *available at* http://www.weather.gov/lwx/20120629svrwx (last updated July 27, 2012.)

tournament went forward as planned, but the Greenbrier asserts that it suffered losses including physical damage to the hotel and facilities, extra work needed to prepare the golf course and facilities, extra salaries, wages, and fringe benefits, adverse publicity, and additional advertising and promotion expenses. The dispute currently centers on a business interruption claim for a period of approximately nine months following the *derecho*. The Greenbrier's insurance policies were purchased through the Resort Hotel Association (RHA) and are largely identical. McLaren's is contracted to act as a claims adjuster for the RHA policies, and Mr. Bianchi was assigned to the Greenbrier's claims. The Plaintiffs assert that the Defendant Insurers paid "a small portion" of their losses, but refused to pay the remainder. (Am. Compl. at ¶ 29.) The Plaintiffs assert claims for breach of the insurance contract, declaratory relief and unfair and unlawful claims practices.

The declaratory relief sought by the Plaintiffs was a declaration that appraisal was not required. The Defendants filed a motion seeking to compel appraisal. The Court found that appraisal was required under the terms of the policies, and stayed the matter pending completion of the appraisal process. Each party selected an appraiser, in accordance with the policies. The appraisers did not agree on the amount of loss, and they jointly selected an umpire. The umpire reviewed the evidence, but declined to hold an adversarial hearing as requested by counsel for the Greenbrier. Instead, each party, and their respective experts, submitted documentation and testimony in the form of affidavits. The Greenbrier's attorney was, however, permitted to examine the Insurers' expert.

The Insurers contracted with Meaden & Moore (M&M) to analyze the loss after the initial claim was made, and M&M continued to provide analysis through the conclusion of the appraisal

3

process.    The Greenbrier initially submitted a claim with the assistance of RWH Myers. However, it used Economic Valuation Associates, PLLC (EVA) during the appraisal process. The Greenbrier claimed a loss of $16,497,138.63 for business interruption, which includes $2,717,740.07 for the period of the Greenbrier Classic and $13,779,398.56 for the period from July 9, 2012 until March 31, 2013.   The Greenbrier also sought $973,886.39 for extra expenses.

M&M and the Insurers maintained that there was no business interruption loss for the period following the completion of the Greenbrier Classic.   This was based on the conclusion that the documentation did not demonstrate that there was a loss (i.e., a reduction in revenue compared to the anticipated revenue) for that period.   M&M relied on 120-day forecasts[2] prepared by the Greenbrier to calculate anticipated revenue.   One was prepared on June 26, 2012, days before the *derecho* and the Greenbrier Classic, and M&M found that the actual experience of the Greenbrier was consistent with the projections contained in the 120-day forecast.   M&M and the Insurers also argued that nothing about the *derecho* or its aftermath could be causally linked to any loss for the nine-month period following the Classic.   The Greenbrier and EVA put forth evidence that revenue increased by about 25% in calendar year 2011 over that in calendar year 2010, and claimed that a similar increase was anticipated in calendar year 2012, but for the *derecho*.   They asserted that the purpose of the Greenbrier Classic was to market the resort as a high-end golf destination, and they expected the participation of high-profile golfers, including Tiger Woods and Phil Mickelson, to support that goal.   They argued that attendance at the Classic was lower because of

---

2 The parties disagree as to whether the 120-day forecasts are an accurate method of calculating projected revenue. The Greenbrier prepared the forecasts for the purpose of setting room rates at a level that would maximize revenue and to schedule staff.   The Greenbrier's manager asserts that the forecasts were updated regularly, were not used to predict revenue, and did not account for anticipated growth.   M&M asserts that it compared past 120-day forecasts with past performance, and found them to be accurate.

the *derecho*, and that impacted revenue in subsequent months. The experts and counsel for both the Greenbrier and the Insurers supplied reports, documentation, and supplemental reports, including responses to each other's submissions, detailing their respective positions.

M&M calculated a loss of $798,116.00, including a business loss of $759,245 during the Greenbrier Classic and extra expenses of $38,871. The Insurers paid that amount prior to this suit. Ultimately, the umpire and the appraiser appointed by the Insurers primarily adopted M&M's methodology. The umpire explains that the Greenbrier calculated its business interruption loss "by applying the growth rate trend of its revenues and attendance at the Classic from years 2010 to 2011 and resort and hotel industry growth trends for the same period to arrive at their projected revenue and reducing the projected revenue by the actual resort and hotel revenue achieved." (Appraisal Decision at 1, att'd as Pl. Ex. 1) (Document 80-1.) M&M "calculated the loss for that period by relying primarily on 120 day forecasts generated weekly by the Greenbrier as part of its regular course of business," beginning with the 120 day forecast for June 26, 2012. (*Id.*)

The umpire and the Insurers' appraiser found that M&M's calculation provided a better estimate of the losses because "it used the Greenbrier's actual experience during the prior three years to adjust the weekly projections in the June 26, 2012, 120 day forecast." (*Id.* at 2.) The opinion further found that the revenue growth trend from 2010 to 2011 was of little import, because "growth over a single year is not necessarily predictive of future growth, particularly where, as here, the operator has only recently emerged from bankruptcy and has invested substantial capital in improving the facility." (*Id.*) The umpire described the claim for additional extra expenses for advertising, a social media hire, and a sales office in Washington D.C. He, together with both

appraisers, rejected some advertising costs and the D.C. sales office, finding that they were planned before the *derecho*. The appraisers and umpire agreed on an award of $26,000 for a social media hire, and $31,000 for advertising. The Insurers paid the additional $57,000 that the panel determined was due.

The Greenbrier's appraiser, G. Nicholas Casey, submitted an affidavit, arguing that the panel erred by relying on the 120-day forecasts despite the fact that the author of those reports, Greenbrier manager Jeff Kmiec, stated that they did not accurately reflect the anticipated growth of the Greenbrier. Mr. Casey further asserts that the process did not permit a sufficient hearing, and that he believes the Insurers' appraiser and the umpire had reached their conclusions prior to considering all of the evidence, prior to the discussion that included him, and prior to the hearing during which the Greenbrier's counsel examined the Insurers' expert.

The Greenbrier also submitted an affidavit and curriculum vitae of Dr. Larry R. Weatherford, and an affidavit by its counsel, Marvin W. Masters, which are the subject of the Defendants' motion to strike. Dr. Weatherford expressed opinions criticizing the methodology and assumptions used by M&M and adopted by the umpire and the Insurers' appraiser. Mr. Masters' affidavit describes his request for a hearing and the content of the hearing in which he questioned the Insurers' expert. Briefing on all motions is complete.

## STANDARD OF REVIEW

### A. *Motion for Summary Judgment*

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va.

Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

### B. Review of Insurance Appraisal

West Virginia does not appear to have directly addressed the standard of review applicable to motions to vacate insurance appraisal awards in recent decades. The Greenbrier argues that an appraisal award may be set aside in case of "fraud, accident, partiality, misconduct, or mistake," or where the appraisers fail to comply with policy terms and procedures. (Pl. Mem. at 15-16) (Document 81) (citing *Wheeling Gas Co. v. City of Wheeling*, 5 W. Va. 448 (1872.) The Insurers argue that appraisal awards may be vacated only in case of fraud, corruption, clerical error, manifest error, or an award outside the scope of the contract—the standard applicable to arbitration awards.

In early cases, the West Virginia Supreme Court applied the same standard to cases involving insurance appraisal and arbitrations. *See Van Winkle v. Cont'l Fire Ins. Co.*, 47 S.E. 82, 89 (W. Va. 1904) (approvingly citing arbitration cases for the principle that an error in judgment regarding the facts is not a sufficient ground to set aside an award, unless the error is 'very palpable'). More recently, the court considered whether an insured could seek *Hayseeds* damages for bad faith after substantially prevailing in the appraisal process. *Smithson v. U.S. Fid. & Guar.*

*Co.*, 411 S.E.2d 850 (W. Va. 1991). In holding that *Hyaseeds* damages were available, the court explained that "[u]nder an ordinary appraisal clause, the only issue is the amount of the loss" and noted the distinction between the procedures used in appraisal and arbitration. *Id.* at 857. The *Smithson* case did not involve the standard applicable to a motion to vacate an appraisal award. Thus, the Court will look to the older cases cited by both parties. Though those cases use slightly different formulations, there is general agreement that arbitration[3] and appraisal awards may be vacated for fraud, corruption, partiality, or other misconduct on the part of the appraiser, as well as for clerical errors, readily apparent factual or legal errors, or an award beyond the scope of the appraisal clause. Courts do not review the facts and law *de novo*.

**DISCUSSION**

*A. Motion to Strike*

The Insurers request that the Court strike an affidavit submitted by an expert, as well as an affidavit by the Greenbrier's counsel. The affidavits at issue were attached to the Greenbrier's reply in support of its motion to vacate the appraisal. The Insurers argue that such submissions are improper in a reply brief, and that the expert affidavit should not be considered because it was not presented to the appraisal panel. The Greenbrier argues that it did make the same arguments before the appraisal panel, including citations to Dr. Weatherford, although it did not submit his affidavit at that stage.

---

3 The Court notes that there have been legal developments with respect to arbitration in the intervening decades, largely designed to reduce judicial oversight and interference in arbitration awards. Because those legal developments are specific to arbitration, which, as noted in *Smithson*, involves more formal procedure, the Court will not apply current arbitration standards.

The Court finds that the motion to strike should be denied. The parties simultaneously briefed a motion to vacate the appraisal award and a motion for summary judgment, involving overlapping issues and arguments. The matters covered in the affidavits are relevant to the standard for vacating an appraisal award, [4] and responsive to the issues contained in the Defendants' response to the motion.

### B. *Validity of the Appraisal Award*

Given the overlapping issues involved in the motion to vacate and the motion for summary judgment, the Court will address the motions together. The Greenbrier argues that the appraisal award should be set aside and a jury should determine the amount of loss. It asserts that the umpire and the appraiser selected by the Insurers acted outside the scope of the contract by failing to appropriately consider the Greenbrier's historic revenue performance before the *derecho*. In addition, the Greenbrier argues that the umpire and the Insurers' appraiser erred by accepting the calculations and methodology used by M&M, the Insurers' expert. The Greenbrier also complains that the process used by the appraisal panel did not provide sufficient opportunity for hearings to examine the credibility of the experts and the Greenbrier's employees, as the panel relied primarily on affidavits and written submissions.

The Insurers argue that the appraisal award is valid and legally binding because there is no evidence of fraud, corruption, or clerical error. They assert that the panel acted within its authority and in compliance with the relevant policy language to determine the amount of loss. They further argue that the appraisal process ensured that the appraisal panel had access to all relevant information, and the Greenbrier was granted the opportunity to cross-examine the Insurers' expert.

---

4 The expert affidavit will be considered only to the extent it addresses misconduct or manifest error in the appraisal award. To the extent it provides new information unavailable to the appraisal panel, it will not be considered.

The Insurers argue that the Court should not consider challenges to the accuracy of the calculations accepted in the appraisal award. Should the Court consider factual challenges and challenges to the methodology, the Insurers argue that the M&M report is reliable, and the appraisal award is accurate.

The insurance policy provisions relevant to appraisal do not differ substantively. The appraisal provision in the Lexington policy provides:

> If the Insured and this Company fail to agree on the amount of loss, each, upon the written demand either of the Insured or of this Company made within 60 days after receipt of proof of loss by the Company, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon the request of the Insured or of this Company, such umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The Insured and this Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.

(Lexington Policy at ¶ 51, LEX0040, att'd as Def. Ex. A) (Document 83-1.) A provision entitled "Business Interruption" provides:

> In determining the amount of net profit, all charges, and other expenses (Including Soft Costs) hereunder for the purposes of ascertaining the amount of the actual loss sustained, due consideration shall be given to the experience of the business before the date of the loss or damage and to the probable experience thereafter had no loss occurred.

(*Id.* at § 12(d), LEX00022.)

Although relatively brief, the written decision setting forth the appraisal award details the claim, the parties' positions, and the panel's reasoning. In summary, it found that the Greenbrier's expert calculated the loss by applying the 2010 to 2011 growth rate to the period following the *derecho*, while M&M compared actual revenue against the pre-*derecho* 120-day forecast, and used historic data to evaluate the accuracy of the 120-day forecasts. The panel explained why it found M&M's analysis more reliable and more consistent with the policy provisions regarding how to ascertain the amount of loss. The appraisal decision reasoned that EVA's reliance on the growth trend from 2010 to 2011 was not reliable because it involved growth over a single year shortly after the Greenbrier emerged from bankruptcy. Under the circumstances, the umpire found that M&M's use of the 120-day forecasts was a more accurate predictor of future revenue.

The umpire and the appraiser selected by the Insurers agreed on the amount of loss and submitted their written opinion, in accordance with the policy language. The Greenbrier argues that "[w]hether one calls it fraud, constructive fraud, corruption or clerical error, or that the appraisers and umpire acted outside their authority and/or [the award] was the result of misrepresentation, accident and/or mistake, it is clear that the underlying bases for the 'award' and the award itself were based on an intentionally flawed and false methodology." (Pl. Reply at 3-4) (Document 86.) The various methods by which an appraisal decision may be vacated are not interchangeable. The Greenbrier presents no evidence of misconduct, fraud, partiality, or clerical error. It argues that the process was insufficient because the panel primarily relied on affidavits and written evidence, and did not permit the Greenbrier to examine its own witnesses in a hearing. The procedures used are common in appraisals and applied equally to both parties. Those procedures do not invalidate the award.

The Greenbrier's primary argument, which it believes could constitute mistake, error, fraud, or place the award outside the scope of the appraisers' authority, is that the panel relied on an expert that used an unreliable methodology and reached the wrong conclusions. It asserts that the methodology was guaranteed to result in no damages because M&M applied post-*derecho* room rates to the pre-*derecho* occupancy forecasts. M&M explained that the post-*derecho* room rates were consistent with historic rates, and the appraisal panel presumably accepted that explanation. Analysis of a business interruption claim based on a hoped-for increase in revenue is necessarily somewhat subjective. In this case, the panel only had approximately two years of revenue data because of the Greenbrier's recent bankruptcy and acquisition by a new owner. There was also little evidence regarding causation. The chart below shows fluctuating and slowing revenue leading up to the *derecho*, and the relationship between the Greenbrier Classic event and changes in revenue in prior years is not obvious. The Greenbrier reasoned that it expended resources on the Classic because it expected the event to raise the resort's profile and increase revenue—but it did not have experts or comparisons with similar events at other hotels to demonstrate that golf tournaments increase revenue for months afterward, or the extent of revenue increase to be expected. Even the evidence that the *derecho* was responsible for a decrease in attendance at the Greenbrier Classic was mixed, and the Insurers' expert proffered alternative explanations. In short, analysis of the claim required the appraisal panel to make subjective judgments in addition to running the numbers.

| | **2010 Revenue** | **2011 Revenue** | **Percent Increase** | **2012 Revenue** | **Percent Increase** |
|---|---|---|---|---|---|
| January | $2,819,525 | $5,369,034 | 190.42% | $4,513,652 | 84.07% |
| February | $2,958,835 | $5,749,245 | 194.31% | $4,844,548 | 84.26% |
| March | $3,779,349 | $5,540,397 | 146.60% | $5,725,126 | 103.33% |
| April | $4,916,463 | $8,068,457 | 164.11% | $8,823,511 | 109.36% |

| | | | | | |
|---|---|---|---|---|---|
| May | $8,341,844 | $10,702,173 | 128.30% | $10,719,151 | 100.16% |
| June | $8,411,518 | $14,162,348 | 168.37% | $13,598,732 | 96.02% |
| July | $15,518,271 | $15,995,255 | 103.07% | $19,479,900 | 121.79% |
| August | $14,168,611 | $15,331,163 | 108.21% | $15,547,677 | 101.41% |
| September | $12,163,113 | $13,629,644 | 112.06% | $15,115,569 | 110.90% |
| October | $11,790,902 | $14,189,775 | 120.35% | $13,944,453 | 98.27% |
| November | $7,978,540 | $7,948,353 | 99.62% | $7,648,821 | 96.23% |
| December | $8,449,097 | $10,212,941 | 120.88% | $9,872,440 | 96.67% |
| | $101,296,068 | $126,898,783 | 125.28% | $129,833,582 | 102.31% |

(reproduced in Z. Meyers Affidavit, Document 80-18.)

The appraisal decision is not erroneous on its face, and the Court will not re-analyze the facts and expert reports that the parties contracted to have assessed by an appraisal panel. The appraisal panel clearly relied on the policy directives to determine the amount of the loss based on consideration of historic performance and the probable experience had the *derecho* not occurred. The Court will not second-guess the panel's judgment regarding the proper methodology to evaluate any change in anticipated revenue, nor will the Court second-guess the subjective judgments that contributed to the conclusions reached. The Greenbrier's challenge is precisely the type of claim courts are not to review, absent manifest error. Thus, the motion to vacate should be denied.

### C. Motion for Summary Judgment

The Insurers argue that they are entitled to summary judgment as to Count One of the complaint, which asserts breach of contract and bad faith/*Hayseeds* damages. They state that they promptly paid the amount they identified as a loss, timely sought appraisal as to the disputed claims, and promptly paid the additional $57,000 awarded by the appraisal panel. Because the Greenbrier did not substantially prevail in the appraisal, the Insurers argue that *Hayseeds* damages

are unavailable. In addition to its arguments challenging the appraisal award, the Greenbrier asserts that the appraisal award "does not resolve quests of fact regarding the Defendants' actions in failing to timely pay for Plaintiffs' losses." (Pl. Resp. at 3) (Document 85.) The Greenbrier urges the Court to permit discovery "to show the extent of Defendants' bad faith." (*Id.*) The Insurers' argue that no material fact relevant to their motion for summary judgment is in dispute, and that the Greenbrier's attorney's affidavit fails to identify any issue that requires additional discovery.

In *Hayseeds, Inc. v. State Farm Fire & Casualty*, the West Virginia Supreme Court held that "[w]henever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syl. Pt. 1, 352 S.E.2d 73, 74 (W. Va. 1986). "An insured 'substantially prevails'…where the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to commencement of the action, as well as when the action is concluded by a jury verdict for such an amount." Syl. Pt. 2, *Miller v. Fluharty*, 500 S.E.2d 310, 313 (W. Va. 1997).

There is no dispute that the Insurers promptly paid the $798,116 loss that they substantiated. They contested the remainder of the Greenbrier's approximately $17 million claim. The Court previously ruled that the Insurers timely demanded appraisal under the terms of the policy, and there is no dispute that the Insurers promptly paid the $57,000 that the appraisal panel awarded. It cannot reasonably be argued that the Greenbrier substantially prevailed in the appraisal that determined the amount of the loss. The Greenbrier has not identified evidence,

either presently available or requiring discovery, that could permit a jury to find a breach of contract or *Hayseeds* damages. Because the Insurers complied with the policy provisions to resolve the dispute regarding the amount of the loss and promptly paid all amounts determined to be owed, the Court finds that the Insurers are entitled to summary judgment as to Count One of the amended complaint.

### CONCLUSION

Wherefore, after careful consideration, for the reasons stated herein, the Court **ORDERS** that the *Plaintiffs' Motion to Vacate and Set Aside the Decision of the Appraiser/Umpire* (Document 80) be **DENIED**, that the *Defendants' Cross-Motion for Partial Summary Judgment as to Breach of Contract and Hayseeds Damages* (Document 83) be **GRANTED**, and that the *Defendants' Motion to Strike the Affidavit and Curriculum Vitae of Larry R. Weatherford and the Reply Affidavit of Marvin W. Masters* (Document 89) be **DENIED**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER:    November 29, 2017

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA